Case number 18-1037 et al. Pennsylvania Interscholastic Athletic Association, Inc. Petitioner versus the National Labor Relations Board. Mr. Baskin for the petitioner. Mr. Weiss for the respondent. Mr. Schwarzfeld for the intervener. I'm Maurice Baskin representing the PIAA, which is the state standards setting body for high school and middle school athletics in Pennsylvania. The NLRB requires the PIAA to be a private employer of high school lacrosse officials, but we maintain those officials are independent contractors and that PIAA is actually a political subdivision under the Act. So for both reasons, the board order should be denied enforcement. Second, the independent contractors issue, the board decision cannot be enforced by this legal standard that this court rejected in the FedEx case. It seems to me actually that what the board did was rely on the restatement standard that our court in Manchester Symphony has since reaffirmed and is the standard. So, you know, I understand that there was some crisscross, you know, between whether the FedEx 1 standard was a substitute or was a supplement or an interpretation, but the board here applied the 10 factors. The parties have briefed this under those factors. So I get that there's a little bit of analogy to the way the board did it in FedEx 2, but it doesn't seem like it was a whole-cloth wrong standard. Well, let me push back on that. The board cited FedEx no less than 17 times in its opinion. It's FedEx. The FedEx standard that was rejected by the court. But also the FedEx standard that the board created goes beyond the restatement. It creates a new independent business test. That's what I don't understand is what is it about the FedEx standard that they cited or about the FedEx case that they cited that you think is wrong and then how that hurts you. Sure. Because it's not just a line of cases. No, let's start with FedEx. What is it about FedEx you think is wrong that they relied on? About their FedEx decision. It's the question of supervision, I apologize, because it's multiple. It's the way they address each factor. Oh, all right. But our case did not address any of that. Our case addressed the entrepreneurial opportunity question. That's the only extent to which our FedEx was overturning their FedEx. But actually the court in FedEx 1 and 2 cited all of the restatement factors. That was an issue in the case. Were they just relying on this entrepreneurial activity issue? In fact, FedEx took issue with the way the board had handled the issue of supervision, the issue of relying on evaluations instead of day-to-day actual supervision of the work, the fact that the agreements were negotiated or not. Our second FedEx case actually totally rewrote what the board had been doing with respect to all factors and not just entrepreneurial activity. I'm sorry, I just couldn't quite hear you. I'm having trouble. It's not anybody's fault. You think that the FedEx case of ours that vacated there, I'm going to call, I don't know, let's get numbers here. You pick a number, FedEx 1, 2, 3. Which one are we talking about now? The one that you don't like is FedEx 4. It doesn't count. There have been two FedEx boards, unfortunately. The first one, which we overturned, and then the second one, which we overturned. You think that the problem with that case that we found was not only having to do with entrepreneurial opportunity but everything, but all the factors under the common law test. But many of the factors that the boards. What we said in our case was the same as our previous case, and so we're not going to have a different rule for what appears to be identical. Isn't that all we said when we vacated? No. The court went beyond that. We, in our brief, and we happened to have written the brief in FedEx 2, challenged the board's application of all the factors. But I would also add that if the court is read as saying, we're just repeating what we said in FedEx 1, it was in FedEx 1 that the court took issue with the board's application of many of the factors. It went through all the factors. And, yes, it was a big one, but the trick that the board had given to supervision, the independence of the supervision, the understanding of the parties, the over-reliance on evaluations, all of those things were part of FedEx 1 and, by extension, FedEx 2. But it may be easier to summarize what's wrong with this if we just go through. But this is not two fairly conflicting views. When you take whatever standard restatement or whatever the board is saying, their application of the tests is putting up some on the scales. It's exaggerating the evidence of day-to-day control. They are making what is very strong evidence in a lot of cases already, including in this court's FedEx CC Eastern and North American guidelines, to mention a few. And the board, in its analysis, when it reaches each of these points, for example, the critical factor of supervision. These officials get no supervision at the games. There's no one in New York looking at the video replays. There's no one at the stands. There's no one telling them how to do it. Unlike the Lancaster Symphony, where you have a dictatorial conductor micromanaging every aspect of the musician's performance on stage, there's no one there. These officials who are having trouble and put up the instruction column as you see them. That's the essence of an independent, skilled specialist who is brought in. Because TIA is not in the business of officiating games. It's actually not in the business at all. They're a standard-setting body. They're there to certify and create a pool of officials from which the schools, the public schools mostly, who are the leaders. So I'm going to do the talking. That's very helpful. So, I mean, in the FedEx board, they held that the dress and safety standards favored employee status. And whereas in FedEx 1, we had acknowledged the dress and safety inputs, but said that they did not weigh in favor of employee status. And so then you're saying when FedEx board sees that differently, and then this board relies more on the FedEx board with that intention. Correct. That's right. Yes. So you said that PAA is not in business. Who pays PAA? Where do they get their revenue stream? Is that the schools? Members pay dues. Actually, officials pay dues. It's an association of all the different constituencies. So members. Which members? Schools? Members. Schools. Budgets are correct. And the difficult, some devastating impact of this decision upsetting 30 years of precedent, actually 100 years that the organization has been in place, is going to be very disruptive. That's what the amicus of the Federation of High Schools is concerned about. We're concerned about it. Professionals, where there's millions of dollars to justify regular employment status of umpires or the like who, by the way, work hundreds of games in a season compared to here, it's 20 hours of work on average, 70% of which are paid by the schools, not PAA. So there's supposed to be no pay them except for a two-week period of what amounts to three playoff games. That's not enough to make some money materially under the wrong lines of precedent. There's at least one case, maybe it was the Title VII case, that separated the period during which the officials are paid by the schools and the period during which the officials are paid by the PAA analog into their employers during the latter. Can you answer that? The board is only for two weeks. They said their employers for the whole season, which is still a minimal amount of time, much less than Lancaster Symphony, where they had an average of 150 hours of music played per year, on which they were paid hourly, not flat fees, because if their performance went wrong, they got paid extra here. It's a fact that net employment is supposed to be an important factor. The board said, what the heck, we're not in the situation where they're not paying them at all. The officials ought to pursue other careers, including as an NLRB agent and a lawyer, and to work for organizations refereeing and officiating at other types of games. Could you say something about that? Yes. It seemed like the board said there wasn't evidence that they were refereeing other games for money. I think in your brief you cited some part of the record where somebody said that they were. Can you talk about that? Yes, there was a very clear testimony to that effect, which is in the record. I know we cited it in our reply brief, and on the issue of the absence of supervision. Not on supervision. I'm asking about their ability to work to ref in other games. That they do so is a specific... That's an ability that they actually do do it, yes. Do it, that's the testimony. The question was asked, do they really do this? They said, absolutely. You have examples of rec leagues and AAU events, college games. Can you just tell me where in the joint appendix... Yes, and I'm... We'll come back on our bite. It's there, and we have our site. We'll come back on your rebuttal. I will do that. What about the insurance that they provide during the period when they're being paid by the states? I'm sorry? What about the insurance? It is awkward. They do not get medical insurance, health insurance. They get liability insurance, and that's just a factor that is inconclusive. It's less than what most employees get. They don't get other types of benefits. They don't get vacations and these kinds of things. So it seems like a relatively minor factor, although the board made it a big deal. The official supply is uncontested. The board heard that as a strong factor. They said, well, the PIA supplies the stadium, but that's not true. The stadiums are supplied by the schools, the public schools, and at the end the thing is held at a public stadium, and Hoshi, I think, was the venue for the 2015 playoffs. Let me ask you, you said the PIA doesn't have deep pockets and that this is really a stress on the organization. Can you put this in context? What else other than just the right to organize and be represented in what I imagine would not be highly complex negotiations, what else is, as a practical matter, at stake here? And I'm thinking partly really of just adjacent areas of law. Title VII, workers' comp, responding to superior liability, tax withholding, benefits. I know this isn't the legal issue before us, but the context might be helpful to know. Yes, I'm glad it's been suited under the Fair Labor Standards Act by these officials. Into the training sessions, whether they should be paid, the seminars they go to to stay current on the rules, all of that. Right at the second page of the complaint it says, well, the National Labor Relations Board has just held that they are employees. So, by extension, let's go all the way. Where the money is going to come from to deal with that is beyond, well, anyone. And it's all because completely upsetting the understandings of all concerned, including the officials who testified, every one of them. They understood they're considered to be independent contractors. And by the area where the board rejected what this court has repeatedly held, the board said, well, that wasn't fully negotiated on equal terms, and it was taken, as you read it, FedEx I, C.C. Eastern, and NAVL all said, that is irrelevant to the consideration for the independent contractor. On that acute level, the board decision should not be enforced. Because you have the right, you say, to enforce it on reasons they articulate. And on that, they articulate reasons that are invalid under this court's blessing. And even in my rebuttal, I want to be sure to mention that on another area that the board completely dropped the ball, did not drop the ball because they let the regional director decide, and that's the political subdivision issue. And on that point, I want to make one point and reemphasize what's in the rules. There's no case where the board of the entity was consistent overwhelmingly of public officials and public rule-of-point officials, which is the case here. But that's what we're talking about. I'm a public official, but when I coach my kids' soccer, I'm not doing that ex officio as a representative of Article III courts. I'm doing that as a parent. And so it just seems like there's a missing link there, the fact that many of these folks are teachers or... No, the missing link is completed, if you will, by looking at Article VI of the Constitution, which is JA 60, because it is very precisely spelled out with input from the board, by the way, which adds to the mix because they designated certain people to be there, not because they like lacrosse. These are not the officiators, not the coaches, although they are also involved. They are representatives of the school boards through the School Board Association, through the principals, the coaches, the athletic directors. They are all required to be on the board. Eight of the... 96 out of the 31 board members in 2015, and this was brought to your email hearing, are representatives and are employees of the public schools. And I would call your attention to Section 2A of Article VI, which says that if they drop out with the public schools, they're supposed to be replaced, although they have discretion to let them stay around, at the discretion of the committee that put them on the board, which, again, consists of public school representatives. They have the discretion to let them stay through the end of the year, but there is the provision there that recognizes them because they're parents who happen to work for the school board, except for two who are specifically designated as such. And one designated from the private schools, but the other two employees and the board has failed to recognize them. I understand your concern about lawsuits. If we hold that you're a state agency, won't that make you subject to suits under 1983? The state? Which you wouldn't be subject to if you're a private entity. Well, the state has already addressed these issues. The state agencies and courts have rejected the notion that the officials are employees, something that the board has overlooked, challenged the board. No, no, no. I'm talking about if the entity that you represent, which is UIA, is regarded as a state agency, then it could be sued under 1983 for a whole host of things that people sue state agencies and state officials under 1983. But that's the dilemma here. They're not being treated as a state agency, for example, under the Right to Know laws. They are already subject to these suits, and now they're being sued from both directions. So there are cases that I've held under 1983 that this association is a state actor? No, not because they didn't do anything wrong. They haven't been sued for that yet. Sometimes you could be sued even if you didn't do anything wrong. Right, right. They haven't been sued for anything. This situation is the state has already declared that these officials are not independent contractors. So they would be sued for that in other contexts. They should not be sued for this if the 30 years of precedent is upheld. You're talking about the state has superior suits, but what about suits directly for the content of PIA's training or whatever? They could be more vulnerable to suit under the state action establishment clause or first amendment, content-based, whatever. It's fine. It's just that we recognize as a political subdivision and as under the Labor Relations Act and the defense to these other claims would be, well, that's as to the National Labor Relations Act. So we'll deal with what else comes later. The other solution is to recognize that these folks, these officials, are independent contractors. Under either approach, the board has dropped the ball. We have to reserve a couple more minutes for rebuttal. Thank you. Good morning. I have a question for the board. Subject to the court's questionnaire, I'd just like to respond in order to a number of mischaracterizations made by the petitioner. First of all, with regard to the quote-unquote FedEx test, there is no such thing as the board's FedEx test, Your Honor. The test for independent contractor status under the National Labor Relations Act is the common law test of agency. That's what both the board and this court are required to comply, to apply under the Supreme Court's opinion in United Insurance, and that's what the board applies to, completely consistent with this court's recent opinion in Lancaster Symphony Orchestra. Just to clarify what the board did in the board's FedEx 2 decision, responding to this court's opinion in FedEx 1, the board felt that it needed to clarify some of its own precedent, existing precedent as to certain considerations it takes into account, factors that are considered along with the restatement common law factors, and in doing so, it organized those under the heading of whether individuals are operating independent businesses with entrepreneurial opportunities for gain or loss. And so, for example, under that sentiment, it considered traditional entrepreneurial opportunity, it considered whether individuals can work for other employers, it considered whether they have a protracted interest in their work, it considered whether they can make decisions such as hiring assistants, and in Lancaster Symphony Orchestra, this court endorsed all of those considerations and, in fact, cited and quoted the board's decision in FedEx 2. So, the actual text here at the end of the day is the common law test of agency, and that's what the board thought, completely consistent with this court's precedent going back 30 years to, for example, this court's decision in City Camp of Orlando, and as we point out, all of the board's analysis of the various factors has been consistent with prior decisions of this court or the Supreme Court. If we could talk about the application in this case, what about the problem raised by opposing counsel that they're only paid for two weeks and only for, it's an hour at a time, right? Correct. We figure the season is relatively short. It's not a year long. And I don't mean the whole season. I take it it's only for the playoffs that they're paid by the PIA. That's correct. How long is that? It's a handful of games, so it's less than the majority of the season, and that's when the officials are paid directly by PIA. Well, it's going to be even during the regular season. PIA is an employer, and it's not dispositive that during the regular season, the officials are paid by a number of schools. One example of a similar employment situation would be City Camp of Orlando, where you had campers paid to the employer for the right to operate a camp, and then they make all of the things paid by customers. They were not paid directly by the employer in that situation, and this court affirmed the board's finding that those individuals were employees under a certain type of employment relationship. So the purpose of the independent contract exclusion in the act is not to limit coverage of the act to the most traditional form of employment relationship where you're on a shop floor and you have a foreman supervising you day-to-day. It was meant to apply to different types of employment relationships as long as there is a common law agency relationship. And that takes me to the second point, which is regarding the supervision factor. Contrary to the act, these officials are supervised based on what they do during games. The calls are not subject to on-field review, but that not only has implications for the games themselves. If, for example, an official makes a bad call, the team, the ROMs have to walk, but that does not mean that PA can't review that bad call and subject that official to possible discipline. In fact, if you read the official's manual and the Constitution and by the extensive regulations that PA maintains, they explicitly say if an official makes a sufficient number of bad or incompetent calls on the field, they're subject to disciplinary removal. In addition, there's a lot of work rules about how officials have to judge games, their conduct on the field, and if they don't comply with that, PA has a right to suspend them and to review it. And the fact that there's no on-field supervisor, again, is not dispositive. I would point to the Supreme Court's opinion, United Insurance, where you had insurance agents who went out into the field, they had no supervisor with them, but at the end of the day, the court would review their work reports and also complaints from customers, and those exact considerations the Supreme Court held were indicative of a lack of independence and of employee status. Turning to Petitioner's claim in opening up that PA is not the business and that it's not generating revenue, that's simply not true. This entity generates millions of dollars in revenue. It's paid for by the officials and the schools. It is a significant non-profit corporation in the state of Pennsylvania, and furthermore, even if it was not generating that degree of revenue, these types of policy considerations are simply irrelevant because Congress's intent in creating independent contractor exclusion was to have independent courts apply to common law vacancy. Neither court nor this court are supposed to take into account policy considerations, even assuming that there are any records supporting these claims of disaster if collective bargaining is allowed. So just help us think about it. I sort of was grouping factors 2, 8, and 10 together, and maybe I'm failing to appreciate the nuances, but it seems like, you know, whether the period of contractor is engaged in a distant occupation or business or it's the same occupation or business, it's like when the plumber shows up at the McDonald's, you know, the plumber is in one business, the McDonald's is in another, and it supports the fact that the plumber is an independent contractor, not an employee. Whether the work is part of the regular business of the employer, again, you know, is somebody who's, you know, doing longer work for my small firm in the same legal field as the firm that I'm running that would tend to favor an employee relationship, and whether the principal is or is not in the same business, it seems to me it's kind of going to the same question. And then that factor here, I take it that Mr. Baskin says, you know, PIA is in the business of standard setting, the officials are in the business of officiating at games, and your response is? Our response is that that's simply not the case. The provision of approved officials is one of the main services that PIA provides to its customer member schools, and one of the main reasons that the schools pay dues to PIA. The sort of distinction that the petitioner draws in its brief simply cannot be drawn. A distinction like that, for example, you could say, you know, Walmart is in the business of operating sufficient supply chains, and its employees are going to stop doing it because they're selling retail goods. That type of distinction is not what the common law is contemplating. What it's contemplating is if you bring in, say, a farmer to do something in your McDonald's, that's clearly in a different business. But here, PIA is in the business of offering officials to its member schools, and in fact it's simply a neutral intermediary, but it's involved at all stages of the process. So it trains, certifies the officials. It continuously issues rule interpretations and trains the officials on those changing rule interpretations. It supervises the officials for the reasons we explained. It has extensive regulations about how the officials actually do the work, and when the officials take the field, they do so in the name of PIA, and it actually explicitly prohibits it from wearing any backpack even if they work for a different business. And what are the strongest factors of all of these factors? I mean, entrepreneurial opportunity would seem in a way similar, well, would seem to favor employee status. Other factors that really stand out for you without just going through them sequentially? Right. Instrumentation and tools to support them. It includes their background. The first factor is their right to control their means and manner of work, because here the PIA, these extensive regulations that it requires officials to comply with, it extensively threatens officials that if they're not compliant, they take a potential discipline. So there's very extensive oversight. Wouldn't that happen with any independent contractor? If they were independent contractors and they didn't do a good job on the field, they wouldn't be rehired again for another game or for the next day. Why is this post hoc discipline or review sufficient to make them employees? Well, the distinction we point out in our brief, which is between what control of the actual means and manner of work versus just control over the results. So if you have a plumber as an independent contractor, the plumbing job he does, then he's rehired again. But you don't have to be rehired about how he's performing the plumbing work when he's doing the work or when these officials are on the field. Well, you might not hire him again if he violated, I don't know, District of Columbia regulations regarding the way in which the pipes were fitted. That would be a reason that you would not rehire him again. Certainly on the results of the work, you wouldn't have to. In this case, we're not saying you have to be at the top when you're doing the plumbing. You have to have a correct, secure position. You can't be, you know, plumbing. You can't position yourself in a certain way, or you wouldn't have a situation where you would say the plumber couldn't wear jewelry while he's doing the job. In a typical independent contractor, so the plumber can come in and do the work in his expertise without being upset about how he's doing it. In the FedEx cases, which you take the proposition they were ultimately held to be independent contractors, correct? Correct. They couldn't wear UPS labels on their clothes or on their cars. They couldn't drive a car that didn't have a FedEx label on the car. They had to take the label on, and if they wanted to do something else, they would then take it off. I assume, I can't remember the case exactly, although I did participate in it pretty heavily, I believe they had to wear something that indicated they were FedEx. That was in a way for the security of the customers, even though they were independent contractors. So clothing alone can't be the answer. No, absolutely not. I'm not even sure how it cuts. When this goes to a vendor, it's positive. So you have situations like that. You may have employees who have a uniform, for example, and that's a situation that typically affects employee status, but because of the further circumstances of that case, this court held that they were independent contractors. I think the key there was that the board itself was ignoring the fact that entrepreneur was not providing sufficient way to entrepreneurial opportunity, which covered some of the other aspects. What about the argument that counsel will make when it comes back up on rebuttal and showing me the pages of the joint appendix where somebody testified that, in fact, they are able to get paying jobs as refs? Yes, Your Honor. The pages is page 30 and 31 of the joint appendix, and with the testimony from the appeal, and it couldn't work out in court. She said it couldn't, and what I think, too, would be that he was specifically referring to their ability to do so. He did not, but I think the officials in this case have. So, in some cases, he's referring to people in general, but I just want to emphasize for the court that this case only involves a unit of approximately 140 La Crosse officials in the Pittsburgh area. So, in that case, for example, there are a lot of people who are not conceding the case, but that's what this testimony suggested. But there are certain testimonies suggesting that in the Pittsburgh area, there are a lot of employees that individuals can go in and work. The very next line is expressly asking about La Crosse. You think that it wasn't? I'm looking at JA30. You think that it wasn't present in the mind of the person who was answering that these were questions about La Crosse? I mean, the individual is referring to just PA officials in general, and furthermore, that's the example that you have. Just to go on, on the next page, 31, do you know of any that have jobs or careers beyond officiating La Crosse? Yes, absolutely. Do you know any that you could tell us about? Well, La Crosse, I don't know, but Mr. Seneca, he's a registered, he's an attorney. All right, I'll hold this until I have a chance to ask. No, just to respond, you know, if you're, the concrete prediction is also eminently reasonable, but my first point would be that, you know, the court certainly owes deference to the board's readings of the facts, and I think it's fair to read that as not being a concrete example. I'd also point out that- Did the board reference this particular back-and-forth? Not specifically. It was insufficient evidence, and that goes to my second point, which is that, you know, it can't be proved to a step in an independent contract relationship because it is an exclusion to the definition of employee in Section 2.3 of the Act. To the extent that the testimony is unclear, the time will appear. And also, to the board point, this is something the board is making, because even if the court assumes that these individuals could work for other employers, the more important point is what this court held in Lancaster Symphony Orchestra, and it was what the board has consistently held, which is that the need to work for other employers if you're a part-time employee is quite minuscule evidence of entrepreneurial opportunity, and that's the only evidence in the record of this consolidation of considerations or this fact of the law with the employee staff that did in that case. Well, there seems to be some kind of people view this factor differently. The question I thought in our FedEx 1 was, is the nature of the way you do this job something that yields to entrepreneurial effort? So you could subcontract, you could work faster and smarter, you could sort of figure out ways to do the delivery work in that case, or here, the refereeing, that would be entrepreneurial. For example, one might imagine a ref who would say, you know, I will come and give a rules talk to your school for 15 minutes before the game if you hire me to do that, or I will, you know, whatever, do special things that make me a more popular coach to be hired. And, you know, they can't substitute someone else. It's hard to see a lot of entrepreneurial opportunity, but the part-timeness and the fact that they also work as an attorney, I think you're right, under Lancaster Symphony, that's not the test. Otherwise, every single part-time job would be independent contractor. That's correct. And this course reasoning, and to go to your point, the symphony orchestra made that point that the inquiry is to use your language whether an individual can work smarter or rather than just harder to make more money. And as the board noted here, that's simply not the case for these officials, and that has implications for a lot, including the fact that, for example, they're paid higher. Well, that's true. This is not a piecework situation where, say, you're producing widgets, and if you come up with a more efficient technique to produce widgets, you can make more money. Let me ask you, sorry to interrupt, the question that I asked Mr. Bassam, which is what else is at stake here from your perspective? It just seems like a curious case. Yes, well, this is, excuse me, this is the victim of the board's decision, but there was some testimony in the record that the board didn't need to, so I'm not going to talk about some of the officials in the press program, you know, making less money, you know, making $100 a day or something along those lines, and that seemed to be one of the motivating factors. But I'm not going to go into the background of employees wanting to exercise their power of law. I think the relevant question to the court is at this point. I'm not asking that so much as, you know, the agency, the employer, employee versus contractor has a lot of other footprints in the law, and whether there are any areas that you administer where there are analogous inquiries where this is either supported or would spill over to them. Just in terms of similar factual situations, Your Honor, against this court's decision of city council, was a similar situation just in terms of the employment relationship. I think Lancaster, New York, Australia is a varied personality, even though there are distinctions. In that case where you have skilled individuals who can choose when or when they don't work and they come in for a relatively brief part of the year and have relatively brief assignments. So thank you, Your Honor. Supreme Court's seminal case on this question is a very similar situation where you have individuals who go out into the field and they're not supervised when they're making the key decisions. In that case it was, you know, negotiating and selling insurance policies to individuals, which took a certain amount of expertise. There was no supervisor sitting over their shoulder telling them, you know, whether what they were doing was right or wrong. But the Supreme Court very clearly held that the fact that the employer nevertheless maintained some kind of back-end review and, in fact, would consider customer complaints very similar to the school evictions during the regular season here, that that was, that was, showed employee staff that, in fact, here you also have the post-season where it's even more clear because PA cuts off the schools in time and actually directs the officials directly. And I see if the Court has any questions about the political sub-division issue, I'm happy to answer them. What about Mr. Baskin's point that under Article VI, Section 2A, B, C, etc., etc., these are many members of the board are representatives of associations of and are employed by the state as school administrators, school teachers, school coaches, etc. Yes, well, I think if you read the PA Constitution closely, there's no doubt that these individuals need to be public school employees and, in fact, nearly 200 of the PA schools are private schools. So there's simply insufficient evidence as to the school employment of these individuals and certainly nothing in the Constitution itself requires public school employment. Now, one point from the Secretary of Education, and that's the provision that references a school board at the time of appointment, but I think it goes to explain a brief section of the Court's decision in the Research Foundation of City University of New York case. In that case, you have an entity affiliated with a public university and the majority of the members on the board of directors happen to be employees of the public university, but what the board explained in that case is that they weren't members of the board of directors of this third-party entity because of their employment. They simply happened to also be public employees. That does not mean that they were— Well, but I will ask Mr. Baskin so he's prepared on the public employee part, but he also pointed out that they have to be employed. Yeah, that's required by the Constitution, right? Well, they need to be— There's no— It has to be a public school. It has to be a public school, and there's also the provision which says even if they're proctored by, say, a public school, they can remain on the board until the next round of elections. And I think what's important is it goes to this broader point again that simply because you're a public employee while you're serving on this extracurricular board, that does not make you responsible to public officials in the meaning of a Hawkins County prong, too, because the public institutions have no authority to this board. They do not have the same decisions you make while you're on this board. They have no authority to remove you from the board. So that simply is not— Well, they can remove you by removing you as an employee. Well, they cannot. If you get fired from your public school employment and you remain on the board of directors of the PIA for the next round of elections— At discretion of the PIA. Correct, familiar to this PIA board of directors. An individual school cannot force an individual off of the board of directors if it wants them off and if it disagrees with their decision-making as unlikely as that scenario is in the first place. This may be a question more for Mr. Baskin, but is the relationship between PIA and the National Federation of High School Associations voluntary? Has PIA chosen that or has the Federation of High School Associations hired PIA? My understanding is that the Federation of High School Associations is in the record because the employers burdened on many of these issues. Once again, any control dictated by this voluntary association, as this court happens in the capital window, that's sort of linked to the question of employee staff because it's a voluntary relationship that PIA is committed to. So there's certainly no evidence that this hostility dictates anything regarding the officials who are at issue in this case. Unless the court has any further questions, I believe the interviewer union has three minutes. Follow me. Can I just ask one more question? Sure. Again, on this question of the membership under the Pennsylvania statute, which requires the association to adopt certain things with respect to the board, ensure that the membership of its board of directors include the following. It says one member representing school boards of directors who is an elected member of a school board of directors. Doesn't that suggest public or private school boards? That's the one you're referring to. The member who is required to be a member of a school board at the time in relation to the board of directors, but to be a public school employee by that time. Interest groups needed to have representatives. So, for example, there needed to be an interest group representative of the Public School Board Association of Pennsylvania, but as we explain, this is not a correlation similar to PIA itself. It does not mean that the employer has no evidence and jurisdiction involved because it did not make this argument for the board, that the state is not involved in actual appointment of individuals, and there are consequences to the board appealing explicitly that the state is not involved in the appointment. So the employer is making that as an even though the state has no involvement in the appointment, some schools who are appointed not by the state may be public school employees, but again, it's simply not the case that in Hawkins County, this court's binding decision in the MMC where this court affirmed and inquired whether you are appointable by, movable by, public officials. So it does not mean that you happen to be a public employee if you were appointed to the extracurricular board by, you know, your public employer itself, which is not the case here. Okay, thank you. I think we did forget that we have an intervener. Sorry about that. I apologize for not mentioning it. No, no, it's my fault. Mr. Schwartzfeld? Thank you, Your Honor. If you think the NLRB adequately handled it, you don't have to say any more. There are a few things I'd like to comment about and try and stay within my time limit, Your Honor. First of all, as was just being pointed out by counsel for the board, these groups that appoint members of the PIAA board are not public bodies. They are associations that have been formed of athletic directors or whatever by their own means for their own purposes, but they're not public purposes, they're not public bodies. So we don't think under Hardin County that there's any real argument that this PIAA should be treated as a public body. So we think that that is clear. There was a question, two other things I'd like to address. One question was what is at stake here? I mean, if you look particularly at the amicus brief that was filed, the Association of Minor League Umpires, which is a local union of the Office and Professional Employees International Union, the same union that's seeking to organize these employees, and they represent referees, I mean, excuse me, umpires all the way through baseball except for professional baseball. But in that brief, they pointed out all the other sports that have the cases that indicate that these people are represented, even though they are very much like these officials. They work part-time, the people that work football on weekends often have other careers and jobs, and these are other things that they do. And they point out baseball. There's, of course, the Umpires Association of Baseball. Football, the NFL officials, arena football, soccer, the NBA, basketball, and golf, officials in all those different spirits are organized and are treated as employees, even though they have the same right that these officials have, which is they control the game and make the decisions about what is going on in the field. Do any of them have a short time of being paid by the association? Well, for example, the NFL people work on weekends. They may work more games, but that's because it's a sport with a longer season, in this particular lacrosse season. In this case, there are a number of officials who work more than one sport, some as many as eight different sports. So over the course of a year, they may work a great deal under PIA's auspices. But each sport has its own season, which is set by PIAA. And the unit that's seeking representation is the lacrosse officials, not a broader unit. Well, that's right, but the lacrosse officials are one unit. If a position is upheld, one can organize officials in other sports. And there are individuals who do take part in more than one sport as officials. Are there any – I'm sorry, just to go back to this question. I appreciate the point about weekends, but how many games are we talking about where they're actually paid by the PIAA? The season, I think, in lacrosse is like eight weeks, and there's maybe two or three games a week. I think the number I remember is between 20 and 24. But those aren't the ones where they're directly paid, right? Those are ones where the schools are paying. How many are where they are directly paid? Well, those are, I think, those are just the finals, and I think there's no more than three, perhaps four games. I'm not sure how many steps it takes. One of the examples that you gave, are there others where the association that has been held to be the employer only actually itself pays for two or three games? Well, these are longer professional seasons. Usually they are longer. Well, this is a longer season also. That is, it's eight weeks, but it seems unusual, and I'm just really asking whether it is unusual, that for the vast bulk of the season the payment comes from the schools. I understand the point, but I'm just asking as a fact question. Are there others where for all but two games the payment comes from the school rather than from the association? The payment comes from the school because PIAA has mandated that. I understand that argument as well. I just want to, as a fact question, are these others that you're talking about, baseball, football, et cetera, are they paid by the school or are they paid by the association? In PIAA itself. Or any other example that you wanted, yeah. I believe in PIAA itself because of the way it has mandated that the schools do the payment except when it gets to the final state eliminations. And do you know with respect outside of Pennsylvania whether that's the way this is done? If you're talking about scholastic, scholastic officials have a series of different kinds of operations across the country, and I don't know enough about the details to know exactly what it is. But as I said, PIAA specifically says the schools are to pay. That could be changed, in our view, under PIAA's authority, and if we negotiated we would probably want to change that. But that's something that seems clear to us. PIAA has the authority to do because they told the schools you're to pay. That's done on their order and their specific statements. Is there another question? Thank you. Thank you. Mr. Baskin, we'll give you another two minutes. Thank you. Can you just begin, if you wouldn't mind, by addressing those pages or what other pages you have from the joint appendix on the question of whether they actually do work outside of the lacrosse game? Yes. Well, the counsel for the board correctly identified the pages but completely mischaracterized the testimony, which you actually caught on to. And I'm just looking at Art. The question is, officials, are they officiating PIAA events? Yes, they are. Do they sometimes do that? See, they're not. Absolutely. And then he lists a series of events, to his knowledge, and specifically are they talking about lacrosse? Of course they are. He's there to testify about lacrosse. That's in line 21 on that page. Talks about playing, what happens if they go to Ohio or Pennsylvania. What about, I'm sorry, what about, again reading closely, it says absolutely they could officiate, they could officiate. For how many persons that further, do you know of any that have jobs or careers beyond officiating lacrosse? Yes, absolutely. He doesn't equivocate. I think use of the word could, it combines the two. Is the testimony in the record then, I should add, not disputed by anybody? The union was right there with their officials. Nobody got up there to testify to say, nope, we're not allowed, we don't do it. In fact, the only testimony, the only record evidence is right here, and it's clear and undisputed. So to pretend that they are not able to do this is simply false. And without having this limited time, a good bit to unpack, you also referenced asking about the two weeks of playoffs. What does that appear in the record? John Appendix 37 and 95. 95 is the actual schedule, and you can count the days that they participate in. It's just this short round of playoffs. To distinguish it, two weeks, four games, and then, of course, not four games, it goes down to one game at the end, starting with a round of 16. And professional leagues. All these leagues are referenced by the amicus brief. I was almost going to call your attention to them in my argument, because compare them. That's the difference. So organizations, and I don't know where this concept came from, that the PIA is fresh with cash. There's no evidence of any type in the record about that. Where we are, the baseball leagues, the NFL, and the like, operate. And when we look at them, they have seasons where the Mike Myers case, which is cited, the report's in the record, that they work something like 150 games, with two days off for the entire summer. That's completely false. What's going on in this case? These are high school and middle school athletics, a public service that the PIA is performing. And to compare it to professional leagues shows what it's not, that the board is mapping after 30 years of well-settled understandings under the Big East case, which even that's more professional because it was college, but it was international. This is a much stronger case, even, than the Big East situation. Can I just pause over that? Do you know, are there any other secondary school officials anywhere else in the country who are regarded as employees for NLRA purposes? I do not have the information. This is the first time it's ever happened. And we have the amicus brief of the NFHS, which indicates that this would be a sea change around the country. So they clearly are concerned. Had I attempted to look at all the other laws, particularly since the board was saying they don't count, they certainly should count for something in Pennsylvania. So I can't swear to admit that I'm guided by what the NFHS has said, which is that it really, the only implication I can take from that is it's not happening elsewhere. It should not happen elsewhere. That's why this case is important. And it is certainly the first time that it's happened with the board. I want to come back to the notion of the 200 private schools that are on the PIA membership. Unmentioned is that there are 1,400 schools, of which 85% of them are public schools. As a result, not a single private school is on the board, was on the board in 2015 when this case went through. I'm the one member who was required to be on the board because of the legislation. This is all a function of the very formation of PIAA. It was started by all the public schools, to keep them straight. Then there was a limited exemption to allow certain qualified schools to come in, but they have always been a small minority. So when he then went into law, there's no telling that they're not really there because they're public employees or public officials. To the contrary, that's exactly why they're there. They're put on by a district committee, which itself consists of, and you have to go through all the rules of the Constitution to figure this out. It's a little convoluted. But there is testimony about it in the hearing as well. District committees are themselves public bodies? Yes, designated in proportions, again dominated by the committees of the membership, districts of the membership. The membership is 85%. Oh, so they're not governmental bodies. They're committees of the membership. Yes. Each district gets an allotment of the number of representatives from the district to the board, and as a result of that allotment, the public schools have a controlling interest guaranteed, regardless of these additional constituencies that have been added in over time. The ones that are mentioned in the section that you refer to the Constitution, the Pennsylvania School Boards Association, the Pennsylvania School Boards Association again, Pennsylvania Association of School Administrators, Pennsylvania Association of Secondary School Principals, Pennsylvania State Athletic Directors Association, are those public bodies? Why don't they have members? Yes, they're not tax-exempt organizations like PSA itself, but their membership consists entirely of the different constituencies. They are representative, just as they would have standing to sue, under representation of the interests of, for example, school boards. Are they regarded as public entities of Pennsylvania, or just private entities that have members who are? They're the schools, and most of the schools, as we know, are public, but the membership are the schools. The criteria is not publicness. The criteria is being a secondary educational institution, right? The ones represented are the school boards. School boards are public. So, by analogy, there is a National Association of Assistant U.S. Attorneys, every member of which is an Assistant U.S. Attorney and, therefore, a federal official, but no one thinks that the National Association itself is a federal agency or any other kind of agency. Is this analogous or not analogous? First to say that they are public bodies themselves, but that they represent public bodies and that, therefore, they are bound to select public officials and employees of public officials. The school boards that are overrun by public school boards, you just cannot ignore the board should not ignore the realities of the situation, and they say it again today. The only public official is this state official who is designated. The school boards are public officials also, and the employees who are members of the PIAA board are required up the chain to these school boards. So that is another avenue of employment, and I'm referring to the Northland Community Health case, another board case, in which 12 of 16 board members of an otherwise private entity were appointed by local boards of supervisors. And the sort of the board, it hasn't, and they just were deliberately obtuse in the decision, which was only the regional director. The board itself never, they did not grant the request for review on that point. For our purposes, it's effectively affirming it, though, right? But they did not wrestle with the statutory issue, which we cited the case that says they're supposed to do that. If they haven't, you should, at a minimum, remand it to let them do it. Well, if, I don't think this is important. I don't think it's important, but if the board affirms a judgment of an ALJ, and the ALJ wrestles with this issue, that would be sufficient in terms of wrestling. We don't require the board itself to do the wrestling. There's a difference. The ALJ has issued a decision, exceptions are a fact, and the board must consider those. In a request for review situation through the regional director in an election, it's discretionary of the board whether to grant the review. And only then do they get a brief on the merits. So they did not address the merits. Even though they dropped it off from the regional director, they did not grant the request for review, so they can't now claim that they considered this seriously. And if you read his very well-reasoned opinion, he hit spurt rightly on this issue of, what are you talking about, no public officials? The entire board of the POA consists of public officials and employees of public officials. So, and the vast majority of the 85%. Let me just ask, do you have more questions? Okay, why don't you have eight minutes? I appreciate your time. All right, thank you. We'll take the matter under submission.
judges: Garland, Griffith, Pillard